UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
                                :
DOUGLAS PITCHER,                 :
                                :
                  Petitioner,   :
                                :   <u>CORRECTED</u>
      - against -               :   <u>MEMORANDUM AND ORDER</u>
                                :
                                :   Civil Action No.
UNITED STATES OF AMERICA,        :   03-CV-3174
                                :
                  Respondent.   :   Related to Criminal Case
                                :   98-CR-0543
--------------------------------X


TRAGER, J.

     Douglas Pitcher petitions, pursuant to 28 U.S.C. § 2255, to
vacate a 121-month sentence and substitute a sentence of time
served, on the ground that he would have received a significantly
shorter sentence had he not been seriously misinformed by his
defense counsel about the benefits of cooperation and the risks
of trial.  Although the former claim is rejected, the latter
claim has merit, and, accordingly, the petition is granted.


## Background

(1)

     In late 1997 petitioner, then 23 years old, was dealing in
marijuana while residing in New Jersey.  Mauricio Saenz, 38 years
old, was his supplier.  At some point Saenz asked petitioner to
act as drug courier for a trip to South America.  Petitioner
declined, in part because, having a prior conviction for

possession of Ecstasy, he did not want to risk another drug-related conviction. He was, however, willing to help Saenz recruit another courier.

Brian Collins, 24 years old, had purchased marijuana from petitioner on a regular basis for the past year. In early November, 1997, petitioner proposed to Collins that he make a trip to South America, on behalf of "Mauricio" and in exchange for $5,000, ostensibly in order to smuggle into the United States a chemical ingredient of the drug Ecstasy. After Collins expressed an interest, petitioner arranged a meeting at petitioner's home attended by petitioner, Collins and "Mauricio." When they met, Mauricio told Collins that the previous courier, a woman, had backed out. He assured Collins that the chemical was one that dogs could not detect. Gov't Ex. 25 at 18; Trial Tr. at 322.

On December 2, Mauricio picked up Collins at his home and drove him to a passport agency in Philadelphia to obtain a passport. At about this time, Mauricio gave Collins a few hundred dollars for expenses and a round-trip airline ticket in Collins' name. Mauricio told Collins that Mauricio's brother ("David") would meet Collins at the airport upon his arrival in Ecuador. Collins departed from John F. Kennedy International Airport on the morning of December 3, 1997. Upon arrival in Ecuador, David met him at the airport, and for the next four

2

nights Collins stayed in a room at a seaside hotel.  On the
morning of Collins' flight home, David packed in Collins' luggage
a number of items which Collins understood would contain the
illicit substance.  On December 7, 1997, upon his return from
Ecuador, Collins was stopped at John F. Kennedy International
Airport.  More than a kilogram of heroin was found in his
luggage, sewn into the lining of various articles of clothing.

Collins was arrested and immediately agreed to cooperate
with law enforcement officials.  He was interviewed that day by
Customs Agent Diana Tsang, and he initially told her that a man
named "Dave" had recruited him for the trip on behalf of
"Mauricio."[1]  However, on January 8, in a proffer session
attended by Agent Tsang, Assistant United States Attorney Dwight
Holton ("AUSA Holton") and Collins' attorney, Collins revealed
that the "Dave" who had recruited him was actually petitioner.
Collins said that petitioner had approached him regarding making
a trip to South America and had discussed compensation, that his
initial meeting with Mauricio had taken place at petitioner's
residence with petitioner present and that Mauricio had used
petitioner's car to drive him to get his passport on December 2.
Collins also discussed conversations he had had with petitioner

---

[1]Petitioner never used "Dave" as an alias.  Collins
testified at trial that he had made up this name, in order to
"hold back information" about petitioner.  Trial Tr. at 144-49.

following his arrest, during which petitioner mentioned a woman, connected with Mauricio, who had been arrested in Texas. These statements were noted in reports by Agent Tsang. However, it was not until much later, in two debriefings conducted about a month before petitioner's trial, that Collins mentioned other aspects of petitioner's involvement.[2]

As part of his cooperation, on March 12, 1998, Collins made a monitored and tape-recorded phone call to petitioner. The tape seemed to confirm aspects of Collins' story and, in particular, contained an acknowledgment by petitioner that he had introduced Collins to Mauricio, and that he knew a "girlfriend" who had previously gone on a similar trip for Mauricio.[3]

On May 5, 1998, Collins pled guilty to the importation of heroin (21 U.S.C. § 952) under a cooperation agreement.

(2)

On April 22, 1998, customs agents, including Agent Diana Tsang, arrested petitioner at his home. Petitioner told the agents that he was aware that this was about Mauricio and about

---

[2]According to Agent Tsang, these included allegations that petitioner took Collins to get his passport photos, that petitioner had maintained phone contact regarding arrangements for the trip and that petitioner had driven Collins to the airport on the day of his departure for Ecuador. However, only the statement regarding the passport photos was mentioned in Agent Tsang's report of these sessions.

[3]The tape's contents will be described in greater detail in the summary of petitioner's trial below.

Collins' trip, and that he was willing to cooperate, but said he wanted first to speak to an attorney. It is undisputed that agents made it clear to petitioner that they were interested in his cooperation. See Tr. of 4/14/99 Status Conf. at 9; see also Trial Tr. at 227, 238. He had in fact been arrested for that purpose. Hr'g Tr. at 102.

Petitioner did not contact his family because he did not want them to know that he had been arrested for another drug-related charge. Instead, he requested that an attorney be appointed because he could not afford one. Petitioner first met his court-appointed attorney, John Jacobs, at his arraignment. At the arraignment, AUSA Holton informed Jacobs that the government was interested in petitioner's cooperation, and Jacobs relayed this to petitioner. Petitioner told Jacobs that he was innocent of the charges. However, Jacobs' efforts, at that stage, were focused on obtaining petitioner's release on bail, and discussions about cooperation were not extensive.

Over the ensuing months, there were discussions between Holton and Jacobs regarding cooperation. Additionally, Agent Tsang contacted petitioner and made appointments with him to meet with her. Petitioner canceled two or three such sessions. At some point thereafter, in April, 1998, petitioner contacted Holton to ask him for Tsang's phone number. Holton told petitioner that it was not appropriate for them to speak and that

petitioner should contact his own attorney. When petitioner later contacted Jacobs, Jacobs was upset to learn that there had been interaction between Tsang and petitioner, and on May 2, 1998 took steps to inform both Tsang and Holton that all future contact should be through Jacobs. Hr'g Tr. at 62.

At some point in May, 1998, petitioner met with Jacobs for the first time since his arraignment, and they met again on several other occasions prior to trial. Jacobs provided petitioner with copies of all material received from the prosecutor pursuant to 18 U.S.C. § 3500, including Tsang's reports of Collins' statements. Jacobs had received a copy of the March 12 tape, and Jacobs and petitioner reviewed its contents together. Petitioner told Jacobs he was innocent and told him a story consistent with the one he later told at trial.

On May 21, 1998, petitioner was indicted for conspiring to import heroin (21 U.S.C. §§ 963, 952), conspiring to possess heroin with intent to distribute (21 U.S.C. §§ 846, 841) and importing heroin (21 U.S.C. § 952). Jacobs continued to discuss the possibility of cooperation with AUSA Holton, but shortly before trial, Jacobs informed Holton that he had become convinced of petitioner's innocence, and that, in light of the government's position that petitioner must admit his guilt, cooperation would therefore be impossible.

Ultimately, in October 1998, petitioner's case proceeded to trial. Collins was a key witness for the government. Collins testified that he had known petitioner since late 1996 and had regularly bought marijuana from him. In early November 1997, while Collins was visiting petitioner for a purchase, he asked Collins if he was interested in making $5,000 by making a trip to South America. Petitioner told Collins that the purpose of the trip was to smuggle into the United States a chemical ingredient to be used in making Ecstasy. Petitioner assured Collins that the trip would be safe and basically like a vacation, but that petitioner himself never made the trip because he feared his strong muscular build would lead to suspicion that he was importing steroids. He also told Collins that he knew a girl who had made a similar trip.

Collins testified that some days later, he told petitioner he was interested in this proposal, whereupon petitioner set up a meeting at his house with "Mauricio" sometime before Thanksgiving. Mauricio's girlfriend (not named) and petitioner's girlfriend Maureen Killemet were also present, but took no part in the discussion. Mauricio had plane tickets with him, but they were in a woman's name. Collins was told that this woman kept postponing the trip, and that the tickets would have to be transferred to Collins' name. He remembered an argument that

7

took place at this meeting between petitioner and Mauricio, but did not recall what it was about.

Thereafter, petitioner continued to act as middleman for Mauricio and phoned Collins numerous times to arrange various details of the trip.  In particular, petitioner told Collins that he would need to travel to Philadelphia to obtain a passport for the trip.  On December 1, 1997, petitioner, accompanied by Killemet, drove Collins to get passport photos at a local studio, paid for the photos and told Collins that Mauricio would reimburse him.  The next day, December 2, Mauricio and Mauricio's girlfriend, in petitioner's car, picked up Collins and drove him to Philadelphia to get a passport.  On the morning of December 3, 1997, petitioner, again accompanied by Killemet, picked up Collins and drove him to John F. Kennedy International Airport.

Collins also testified that, during his trip to Ecuador, he called petitioner several times at petitioner's home in New Jersey to complain about the trip.  Collins also testified regarding his arrest, his decision to cooperate and his recorded phone call to petitioner on March 12, 1998.

The tape-recorded phone call ("the tape") was admitted in evidence.  On the tape Collins explained to petitioner his plight and his need to find Mauricio in order to avoid jail time.  He asked petitioner for information leading to Mauricio.  Petitioner expressed a willingness to help.  However, throughout the tape,

petitioner was guarded and hesitant.  At one point he expressed
certainty that Collins' phone line was tapped.  Gov't Ex. 25 at
19.

Nonetheless, petitioner made several significant admissions
on the tape, which lasted about forty-five minutes.  In
particular, petitioner acknowledged that it was he who had first
introduced Collins to Mauricio.  Id. at 11, 35.  When Collins
asked petitioner if he was supposed to receive anything from
Mauricio in return for this introduction, petitioner denied it.
Id. at 66.  At another point, petitioner mentioned a "brawl" he
had with Mauricio while Collins was present, because Mauricio was
asking petitioner to do various favors and petitioner did not
want to get involved.  Id. at 17, 35.

On the tape, petitioner correctly told Collins that
Mauricio's last name was "Saenz" and said that he operated in
Linden, New Jersey.   Id. at 3, 6, 12.  Petitioner said he had
known Mauricio for less than a year, and had met him through a
man named Tony.  Id. at 8.  Petitioner had been in Florida with
Mauricio and knew that Mauricio's girlfriend had friends in Fort
Lauderdale.  Id. at 5, 9.  Petitioner mentioned that he had
allowed Mauricio to use petitioner's own beeper.  Id. at 4.

Collins asked petitioner about a "girl" petitioner knew who
had been in trouble.  At first, petitioner seemed to deny that
this girl was connected to Mauricio.  Id. at 6-7.  However, later

in the tape, petitioner identified her as his girlfriend, Brandy, and admitted she had once made a similar trip for Mauricio. <u>Id</u>. at 15. Petitioner insisted that Brandy knew nothing about Mauricio except his first name and would never admit making the trip in any event. <u>Id</u>. at 16. He said Brandy had got in big trouble in Texas for "driving pot," but this was "on her own." <u>Id</u>. at 6-7, 16.

Petitioner made many other comments suggesting awareness that Mauricio was a drug dealer.[4] Regarding Mauricio, he remarked: "If you're that old, and you're ... still doing that, you really got problems.... It's not like ... us ... you go through a phase ... at some time you realize it's just not right.... He's ... 38 years old and he's still doing this...." <u>Id</u>. at 10. He said that when Mauricio called him, it would always be from payphones. <u>Id</u>. at 11. He reminded Collins that, during the "brawl," Mauricio had said "I've been doing this for all my life." <u>Id</u>. at 17. After discussing Mauricio and his brother, petitioner remarked: "These guys ... just have connections because they're Columbian.... [O]ver there everything's ... dirt cheap." <u>Id</u>. at 20.

At one point, petitioner reminded Collins that, because of

---

[4]Of course, prior to the taped conversation, Collins had already told petitioner that he had been caught with heroin.

10 align center

10

what happened with someone named Jay,[5] Collins would not have

gone if he had known "what it was." _Id_. at 28.  Collins agreed,

saying that he knew people who had gotten "all fucked up" and he

would not want to support that habit for anybody.  _Id_. at 28.

Later in the conversation, Collins tried to return the

complement: "Especially that shit too.  It's not like ... you

would definitely ain't involved in none of that."  Petitioner's

response was noncommittal: "Yeah.  I don't know.  But.  Well...."

Id. at 36.

They discussed Ecstasy at various points.  Collins said his

lawyer had told him that when they make Ecstasy, they put heroin

in it.  Petitioner corrected him: "That's only in some cases."

_Id_. at 29.  Collins asked petitioner if Mauricio actually ever

made Ecstasy.  Petitioner was unsure, but said Mauricio had

spoken about getting one ingredient from Quito and another from

Spain.  "I don't think you need that much ... stuff to ... make a

pill....  [T]hat sounds a little farfetched," petitioner added.

_Id_. at 29.

The government also presented phone records that showed 19

phone calls between petitioner and Collins in the 26 days

preceding the trip, and calls at the time of the trip.  Other

government witnesses included a drug expert, a chemist and a

---

[5]Collins clarified at trial that "Jay" was a friend of his
who had become addicted to heroin.

travel agent.  The chemist's testimony included a discussion of the street value of Ecstasy, which he placed at about $20 a pill. He also testified regarding various chemical ingredients used to make Ecstasy, all of which come in liquid form.  The travel agent confirmed that an airline ticket in a woman's name had been exchanged for the ticket issued in the name of Brian Collins.

(4)

Petitioner testified on his own behalf.  He conceded that he had introduced Collins to Mauricio while both were present at his own house.  However, he denied that he had done this so that Collins would make an importation trip for Mauricio.  In fact, he had tried to talk Collins out of taking the trip, which led to an argument between himself and Mauricio.  He also tried to dissuade Collins during the phone conversations in the weeks that followed.  He did not know that Collins would be importing drugs, but rather believed what he had heard Mauricio tell Collins – that the substance would be a chemical ingredient for the manufacture of Ecstasy.  Petitioner denied driving Collins for his passport photo or to the airport.  He admitted having previously been arrested at a nightclub with 117 pills of Ecstasy in his possession, but claimed these pills, which had cost him $15 each, were only for himself and his friends.  He admitted to dealing in marijuana.

During summations, the government argued that petitioner's story was not credible.  In particular, the government argued that Mauricio would not have sent Collins, who was a total stranger to Mauricio, on a drug trip, unless someone Mauricio trusted had vouched for Collins.  That someone could only have been petitioner, who admitted introducing Mauricio to Collins at his house.  Jacobs, in turn, argued on behalf of petitioner that the tape established petitioner's innocence.  Collins, he claimed, was just not credible, and had belatedly invented testimony against petitioner because Mauricio was still at large and Collins needed someone to give the government.  Jacobs focused on the timing of certain aspects of Collins' story, such as his belated revelations about petitioner driving him for passport photos and to the airport.

For the two conspiracy counts, the jury was instructed as to Count One that they must find that the objective was to "knowingly and intentionally import heroin or any other controlled substance," and as to Count Two that the objective was to "knowingly and intentionally possess with intent to distribute heroin or any other controlled substance."  The jury was further instructed that the chemical used to make Ecstasy was not a controlled substance.  On October 16, 1998 the jury, after deliberating for three hours, convicted Petitioner of conspiring

to import heroin (21 U.S.C. §§ 963, 952), conspiring to possess
heroin with intent to distribute (21 U.S.C. §§ 846, 841) and
importing heroin (21 U.S.C. § 952).

(6)

Shortly after trial, but before sentencing, Jacobs arranged
a meeting with the government. Jacobs argued that petitioner was
wrongly convicted; that since petitioner did not know the scheme
involved the importation of a narcotic drug, he was guilty, at
best, of scheming to import a chemical substance without a
permit. The government rejected these arguments.

After the above meeting, in December of 1998, Mauricio Saenz
was arrested. Saenz admitted his role in the operation and
agreed to cooperate with authorities. Saenz told authorities
that he had asked petitioner to help him recruit a new courier
after a scheduled courier had backed out, that petitioner had
known the purpose of the trip was to import a narcotic drug, and
that Saenz and petitioner both lied to Collins about the
substance being an ingredient for Ecstasy. The government
relayed this information to Jacobs as a courtesy. Jacobs then
confronted petitioner, and petitioner admitted that he had lied
about his role in the conspiracy.

Jacobs then asked the government to permit petitioner to
cooperate. The government was skeptical, but agreed to a proffer
session, which was held on March 3, 1999. Petitioner admitted he

had known the scheme was to import a controlled substance, that he had taken Collins for his passport photo and to the airport, and that he had loaned Saenz his car for the purpose of driving Collins for his passport.

On April 14, 1999, a post-conviction status conference was held before this court. AUSA Holton indicated that petitioner had been directly offered cooperation immediately following his arrest and had apparently considered cooperation over the following months. Tr. of 4/14/99 Status Conf. at 9. When this court asked petitioner why he had declined to cooperate, petitioner explained that he was scared, thought his role was minor, did not see himself as guilty, and thought he had a very good chance of winning at trial. His understanding was that if he cooperated, he would get ten years, and at the time, he had not heard of the possibility of a § 5K1.1 letter. He had not understood everything Jacobs told him about the benefits of cooperation, and Jacobs told him he had a "good shot" at trial. Id. at 15-16.

Jacobs confirmed that the government had been eager for petitioner's cooperation, and said that petitioner, in turn, had been eager to testify against Saenz. Id. at 16-17. According to Jacobs, the main factor preventing petitioner from cooperating was his unwillingness to accept, intellectually, that he was guilty. Id. This was critical since the government had made

clear that a guilty plea was required for cooperation.  Id. at
17.  Jacobs also stated that if petitioner had told him the
truth, he never would have gone to trial, and that he felt that
petitioner had a credible defense based on the comments
petitioner made in his tape-recorded conversation with Collins.
Id. at 23-24.

Shortly after this conference, petitioner wrote a letter to
the prosecutor, Dwight Holden.[6]  In the letter, petitioner
claimed that he had wanted to cooperate with the government, but
that his attorney, Jacobs, had advised him to cease all
communications with both Holden and the agents, and had told him
that he, Jacobs, would handle the discussions from that point on.
He wrote:

> I was told[7] if I would cooperate I would get under the
> 10 [year] guide line.  I was not aware or informed of
> all the reductions and programs I was eligible for, nor
> if I assisted there was a good chance I wouldn't
> receive any time at all.  By the information I was
> given it seemed going to trial was the only hope.  I
> only wish I knew more about the 5K1 letter at that
> time.  However, it was embedded in my head by my
> attorney that my case would be dismissed.

Petitioner also indicated that he had not adequately understood

---

[6]The letter was dated April 26, 1998 and received by the
prosecutor's office shortly after May 3, 1999.  Presumably, it
was actually composed on April 26, 1999.

[7]This was no doubt meant to read "not told" since that would
be consistent with what petitioner told the Court some days
before he wrote this letter as well as with the paragraph's
overall point.

the law of conspiracy.

On June 11, 1999, this court appointed Susan Kellman to replace Jacobs as petitioner's attorney. Additional status conferences were held on July 14, 1999, and December 10, 1999, with Kellman representing petitioner. There was some discussion at the December 10 conference about whether Jacobs might have been ineffective in advising petitioner. The government argued that Jacobs had urged petitioner to cooperate, and, in any event, had apparently believed his client's innocence, and, after the conviction but before Saenz was apprehended, he "spent a half hour trying to convince [AUSA Holton] that petitioner was, in fact, innocent." Tr. of 12/10/99 Status Conf. at 21.

On March 10, 2000, this court sentenced petitioner, for each of the three counts of conviction, to a concurrent term of 121 months, at the bottom of the applicable guideline range.[8] (7)

Petitioner appealed his conviction to the United States Court of Appeals for the Second Circuit. Petitioner argued, inter alia, that he would have pursued a cooperation agreement but for the ineffectiveness of his counsel before trial, and that counsel should have sought a special verdict as to whether petitioner knew the conspiracy involved a controlled substance.

---

[8]In contrast, Saenz, who immediately cooperated following his arrest, received a sentence of only 13 months.

Petitioner argued, in his main brief, that Jacobs was ineffective before trial on the following grounds: petitioner "was not adequately advised as to the elements of the crimes charged and as to his culpability for the crime, nor was he advised as to the significance of a cooperation agreement and its sentencing implications," see Brief for Defendant-Appellant at 1; petitioner "was never advised by trial counsel before trial of the significance of a 5k1 letter...," see id. at 16; Jacobs "failed to adequately explain to [petitioner] the law of conspiracy," see id. at 17; Jacobs was "remiss in not getting [petitioner's] family involved until after the trial was over" and "did not properly advise [petitioner] of the elements of the crimes charged and the irrelevance of whether he had a monetary stake," see id. The brief also alleged that "it was counsel's decision alone not to allow [petitioner] to cooperate." Id. at 19. Petitioner made no other allegations in support of the claim of pre-trial ineffectiveness.

On April 10, 2001, the Second Circuit affirmed in a summary order petitioner's judgment of conviction. With respect to the claim that counsel had been ineffective during plea bargaining, the court noted that petitioner "proceeded to trial because, in his words, he 'didn't think [he] was guilty' and 'thought [he] had a good chance of winning,'" and, therefore, held that "[a]ny deficiency in counsel's performance on this subject is properly

18

attributable to Pitcher's own dishonesty in dealing with his lawyer; Pitcher's counsel admitted that, [sic] 'Had [he] realized the truth of what had actually occurred here before we went to trial, [he] never would have went to trial.'" United States v. Pitcher, 2001 WL 356941 (2d Cir. Apr. 10, 2001). The Second Circuit also held that the proposed special verdict would have been irrelevant. "The government needed only to prove that: i) the drug imported was heroin and ii) the defendant had the intent to import any controlled substance." Id. at 121, citing United States v. Obi, 947 F.2d 1031, 1032 (2d Cir. 1991) and United States v. Collado-Gomez, 834 F.2d 280, 280-81 (2d Cir. 1987).[9]

(8)

Petitioner's current petition was filed on June 26, 2003. On July 27, 2004, an evidentiary hearing was held before this court concerning petitioner's § 2255 motion. Petitioner testified on his own behalf. Jacobs and Holton testified for the government. Much of the information conveyed during this hearing has been incorporated into the summaries given above. The summary below focuses on that which is in conflict or of

---

[9]Although the Second Circuit did not say so explicitly, its reasoning strongly implies that there is no legal significance under these circumstances (i.e., where the actual substance turns out to be heroin) to the distinction between the two mental states of knowingly conspiring to import a controlled substance, and knowingly conspiring to import a chemical intended for the manufacture of a controlled substance.

particular significance.

Petitioner testified that he cancelled two or three meetings with Agent Tsang because petitioner had no driver's license and because the friend he relied on to drive him was often unavailable. Hr'g Tr. at 11-12. After petitioner spoke to Holton some time in May, and was told such contact was improper, he made no further efforts to schedule such meetings on his own. Id. at 12-14, 16. When he met with Jacobs about two weeks later, Jacobs told him that if he cooperated he would be subject to a mandatory minimum of ten years, and that if he did not cooperate he would get anything above ten years. Id. at 14. Jacobs told him that the government's case was weak and that they were "bootstrapping their indictment" – that they had indicted him for the wrong offense, and should have charged him with Ecstasy instead of heroin. Id. at 15, 41. Jacobs told him he would be acquitted for this reason, and not because his claimed lack of involvement was otherwise credible. Id. at 40. Jacobs assured him that the tape worked in his favor because it verified that he had been misindicted.[10] Id. at 40-41. On the basis of this advice, petitioner decided not to cooperate. Id. at 17.

Petitioner met with Jacobs three to five times in all, but

---

[10]Presumably, this would be because the tape supposedly showed that petitioner thought it was a chemical ingredient for the manufacture of Ecstasy.

after his first or second meeting, the two had no more
discussions about cooperation.  <u>Id</u>. at 27.  No more meetings
were arranged with the government, and petitioner never again
spoke to Tsang.  <u>Id</u>. at 16.  Jacobs had told him that there was
no way to get underneath the mandatory minimum sentence and had
never mentioned a § 5K1.1 letter.  <u>Id</u>. at 18-19.  Petitioner said
Jacobs discussed the possibility of taking the stand at trial,
but "we never went over it," and when he did testify, it was a
shotgun decision.  <u>Id</u>. at 49-50.

Jacobs testified that he has been a criminal attorney since
1970 and has handled thousands of criminal cases as either
prosecution or defense.  <u>Id</u>. at 55.  His memory of the case was
unclear, and he could no longer recall which specific substances
were at issue.  <u>Id</u>. at 56, 59.  However, he contradicted
petitioner on various points.  He had explained the benefits of
cooperation, and told him that he would have a chance to "walk,"
but that he could not guarantee it.  <u>Id</u>. at 59.  He discussed the
§ 5K1.1 letter "numerous times."  <u>Id</u>. at 61.  The option of
pleading guilty without cooperating was also discussed.  Jacobs
explained to petitioner about the mandatory minimum and that he
was not eligible for the "safety valve" because of his prior
conviction.  <u>Id</u>. at 60.  He and petitioner had at least three or
four conversations about taking the stand, and Jacobs prepared
petitioner by going over direct and cross.  <u>Id</u>. at 63.  He denied

that he had ever advised petitioner not to cooperate.  <u>Id</u>. at 79.

Jacobs' testimony, however, confirmed petitioner's claims that Jacobs had been highly optimistic to petitioner regarding petitioner's chances at trial.  Jacobs testified he had thought petitioner was not guilty "if that was his story."  <u>Id</u>. at 58-59. He tested petitioner's story with the evidence from the case and with Collins' version of events, and concluded that petitioner's story was consistent.  <u>Id</u>. at 63, 68.  He believed the jury would acquit petitioner, and that the tape supported his statements. <u>Id</u>. at 63.  He felt, "absolutely," that the government's case was thin.  <u>Id</u>.  Jacobs placed special emphasis on the tape transcript as supporting this assessment.  "If I remember correctly, the transcript was about as strong a piece of evidence as I've seen in the years in the drug cases.  I thought he would be acquitted on that and so did Mr. Pitcher."  <u>Id</u>. at 72.

## Discussion

In order to prevail on a claim of ineffective assistance of counsel, petitioner must establish two things.  First, Jacobs' performance was constitutionally deficient.  Second, the deficient performance prejudiced his defense.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  The right to effective counsel arises under the Sixth Amendment and attaches at all critical stages of the proceeding after the initiation of formal

charges. <u>Moran v. Turbine</u>, 475 U.S. 412, 431 (1986). This has been held to include plea negotiations. <u>See</u> <u>Cullen v. United States</u>, 194 F.3d 401, 404 (2d Cir. 1999); <u>Boria v. Keane</u>, 99 F.3d 492, 496-97 (2d Cir. 1996).

Petitioner's claim of ineffectiveness can be divided into three elements. First, petitioner has claimed that Jacobs was ineffective because he incorrectly told him that if he cooperated, the minimum sentence he could receive would be ten years. Second, he claims that Jacobs advised him not to cooperate. Third, he has claimed that Jacobs gave him an unreasonably positive prognosis about his chances of winning at trial – that he assured him the case was "winnable."

(1)

If petitioner's first claim were credited, there would be little question that Jacob's representation would be constitutionally deficient, resulting in petitioner being seriously misinformed about facts critical to his decision to reject a plea agreement with cooperation. <u>See</u> <u>United States v. Gordon</u>, 156 F.3d 376 (2d Cir. 1998) (counsel ineffective where client rejected a plea offer with an exposure of 7 years after being misinformed that convictions would expose him to 10 years, but instead received 22 years). However, self-serving post-conviction claims regarding counsel's advice, without some further evidence, are generally insufficient to establish

ineffectiveness.  See Johnson v. Duckworth, 793 F.2d 898, 902 n.3

(7th Cir. 1986).  Since petitioner has already perjured himself

before this court in the hope of avoiding conviction, there are

particularly strong grounds for giving little weight to

allegations that cannot be otherwise confirmed.

With the above in mind, one cannot credit petitioner's claim

that Jacobs told him that even with a cooperation agreement he

would still receive a minimum of ten years.  Jacobs denied that

he told petitioner anything of the sort.  Moreover, it appears

unlikely that a defense attorney with Jacobs' experience would

have been so entirely unaware of the potential benefits of

cooperation agreements,[11] or would have any motive to mislead his

client in such a manner.  Moreover, when questioned by this court

at the August 14 status conference, petitioner appeared less than

certain about what precisely Jacobs told him.  See Tr. of Status

Conf. 4/14/99 at 12-14.  A more plausible possibility might be

that petitioner misunderstood statements by Jacobs that were

meant to apply to a guilty plea without cooperation.  Such

confusion might be more likely if Jacobs failed, under the

circumstances, to place appropriate emphasis on the benefits of

cooperation as contrasted with the dangers of trial.  However, to

---

[11]Jacobs, in fact, demonstrated such knowledge at trial when
he cross-examined Collins on the benefits he expected to receive
as a result of his cooperation agreement.  Trial Tr. at 203-05.

the extent that any weight can be given to this possibility, it is best considered in the context of petitioner's remaining allegations.

(2)

Petitioner's second allegation is that Jacobs advised him not to seek cooperation with the government. This allegation, he claims, is confirmed by Jacobs' statements during trial. During Jacobs' direct examination of petitioner, Jacobs elicited from petitioner the testimony that his attorney had advised petitioner not to cooperate with the government. Trial Tr. at 328. Later, at sidebar while discussing the relevance of this testimony, Jacobs directly told this court that he was the attorney who had given petitioner this advice. Id. at 334.

This argument standing alone is unconvincing. Jacobs testified at the hearing that he advised petitioner that AUSA Holton would never agree to cooperation unless petitioner was prepared to admit his guilt. Holton has confirmed this. Jacobs further testified that he did explore the possibility of cooperation with petitioner, but that petitioner vigorously asserted his innocence. Therefore, faced with petitioner's claim of innocence, it would be reasonable for Jacobs to advise petitioner that cooperation was not an option for that reason. Since there is no claim that Jacobs advised petitioner not to admit guilt, Jacobs' testimony at the § 2255 hearing that he

never advised petitioner against cooperation need not be
construed as contradictory. Jacobs' purpose at trial, in
eliciting the claim that petitioner's attorney had advised him
against cooperation, was to counter any negative inference that
the jury might draw from petitioner's failure to cooperate. One
need read no more into Jacobs' remark, uttered as it was in the
context of advocacy.

Of course, it may be that, considering that often guilty
clients initially claim innocence to their lawyers, Jacobs was
too quick to accept petitioner's assertions and ought to have
pressed petitioner further on the subject. However, the strength
of such an argument would depend on the plausibility of
petitioner's tale in light of the evidence against him. To the
extent that any weight may be given to this possibility, it tends
to merge with petitioner's third allegation.

(3)

A third element of petitioner's claim, essentially, is that
Jacobs misled him by providing an unreasonably optimistic
estimate of his chances of acquittal. Specifically, petitioner
claims his trial attorney told him the case was "winnable," that
the government had charged him under the wrong statute and that
he should have been charged with Ecstasy. Pet'r's Mem. in Supp.
of Mot. at 1, 2; Pet'r's Post-Hr'g Submission at 1; Hr'g Tr. at
14-15, 17, 40-41; see also Declaration of Douglas Pitcher at ¶ 7

("Mr. Jacobs [said] that he believed we would win at trial, and that therefore I should go to trial").

Jacobs has confirmed that his estimate was very optimistic. He urged petitioner to consider cooperation, but at some point ceased these efforts after he became convinced, based on his assessment of the tape and other evidence, that petitioner was innocent and that the jury would acquit. See, e.g., Hr'g Tr. at 58-59, 63, 68. These admissions adequately confirm petitioner's claims that such optimistic assessments were communicated to him directly.[12]

Jacobs' optimism regarding petitioner's trial prospects was based on two distinct assessments. First, he believed that petitioner's version of events, as distinct from that provided by Collins, was credible: "I thought the jury was going to acquit him. I thought the tape supported his statements." Hr'g Tr. at 63. Second, he believed that even if the jury believed Collins the evidence was still not sufficient to establish that petitioner had the necessary state of mind to commit the crimes charged, because it showed that petitioner, like Collins, believed the ingredient being imported was not a controlled substance. The recording of the conversation of March 12 played

---

[12]Jacobs never explicitly confirmed that he communicated such an assessment to petitioner and seems not to have had a sufficiently clear memory of his conversations with petitioner to provide anything more precise. See, e.g., Hr'g Tr. at 59.

a major role in both assessments: "the transcript was about as strong a piece of evidence as I've seen in years in the drug cases. I thought he could be acquitted on that." Hr'g Tr. at 72.

With regard to the first aspect of Jacobs' assessment, it is impossible to agree that the tape supported petitioner's version of events rather than that of Collins. The tape was highly inculpatory. It confirmed major aspects of Collins' story, which Collins had <u>already</u> provided to law enforcement authorities before the tape was made. It confirmed that petitioner had introduced Collins to Mauricio at petitioner's house and that petitioner's "girlfriend" had also made such a trip for Saenz. It showed that petitioner was closely involved with Saenz and was generally familiar - more so than Collins – with the world of illicit drugs, that petitioner knew Saenz was a drug dealer and had traveled with him and that petitioner had lent Saenz his beeper so he could contact him, whereupon Saenz would call petitioner from payphones.

The tape is "exculpatory" only in the sense that it was consistent with aspects of petitioner's self-serving account. Its reference to an argument with Saenz is roughly consistent with petitioner's claim that he argued against the trip. Yet to say this is only to give petitioner credit for some creative guile. Petitioner knew what was on the tape, and what Collins'

story was, long before he testified at trial, and (most likely) long before he gave any detailed account to Jacobs. But petitioner, unlike Collins, could have concocted his account in its entirety <u>after</u> he knew what was on the tape. For all a jury would know, petitioner could have concocted his story on the eve of trial. Therefore, a rational juror would not have treated the tape as an <u>independent</u> confirmation of petitioner's tale.

It requires little creative skill to weave a few true facts into a work of fiction. All the tape truly established on this point was that petitioner and Saenz had an argument, which can hardly be an unusual event among criminal co-conspirators. Even if one credits self-exculpatory statements petitioner made on the tape (ignoring petitioner's awareness that the call might be monitored) it establishes only that he did not want to become "involved" himself, not that he opposed Collins' involvement. Indeed, the tension between his desire to avoid personal involvement and his desire to assist Saenz provides the motive for recruiting Collins. The tape is "exculpatory" in the limited sense that it does not literally amount to an explicit confession. However, one does not ordinarily expect explicit confessions from drug dealers when using telephones, especially where, as here, petitioner was aware of the likelihood that the

call was being monitored.[13]

This aspect of Jacobs' assessment is so unconvincing that, notwithstanding his assertions that he believed petitioner, it is hard to believe he gave it much weight.[14] This is supported by Jacobs' comment, at the April 14, 1999 status conference, that "[h]ad the defendant acknowledged that he knew it was a narcotic drug, which is my whole defense here, that it was so-called Ecstasy, I would have tried to negotiate." Tr. of 4/14/99 Status Conf. at 24. It is necessary, therefore, to address this second aspect of Jacobs assessment.

Jacobs believed that, even if one were to credit Collins, there was still insufficient evidence to prove that petitioner knew that the scheme involved the importation a controlled substance, as was arguably required. Cf. United States v Morales, 577 F.2d 769, 776 (2d Cir. 1978) ("[a] defendant need not know the exact nature of a drug in his possession to violate § 841(a)(1); it is sufficient that he be aware that he possesses some controlled substance.") But Jacobs apparently also believed

_____

[13]Indeed, in light of the fact that petitioner expressed an awareness that the line was probably being monitored, it is surprising that the tape is as incriminating as it is.

[14]If Jacobs truly had confidence that his client's account was truthful, it is hard to understand why he did not call petitioner's girlfriend, Maureen Killemet, to verify petitioner's version of events and to contradict that of Collins, since she was present, or alleged to have been present, during so many of the contested interactions.

such reasoning applied even to the conspiracy to _possess_, it apparently not having occurred to him that the possession and distribution of Ecstasy itself (as opposed to a chemical ingredient thereof) was unquestionably the ultimate goal. At trial, Jacobs prevailed in his argument that a jury instruction reasonably compatible with this view be given, at least with regard to the conspiracy to import. The jury was instructed that a chemical ingredient for the manufacture of Ecstasy was not itself a controlled substance.

Nonetheless, Jacobs was not able to keep any of the charges from going to the jury. There was easily adequate evidence from which the jury could infer knowledge, most of which was known to Jacobs prior to trial. It almost defies belief that an adult would not realize that, if a drug dealer pays someone $5,000.00 plus travel expenses for a trip to South America to smuggle back a chemical substance, he would not realize that it was at least highly likely that the substance was an illegal drug. This alone, together with the inevitable conscious avoidance instruction, was a sufficient basis to submit the case the jury and secure a conviction. But even if one could believe that Collins was this naive,[15] there was evidence, known to Jacobs

---

[15]In fact, Collins never actually claimed he was naive enough to believe he was not importing a drug. He merely claimed not to know the drug was heroin. In fact, in his plea allocution, Collins admitted he _did_ know he was importing an

before trial, from which a jury could infer that petitioner was more savvy than Collins about the drug business. Petitioner had a prior conviction for possessing Ecstasy pills in quantities consistent with distribution and was more likely to be aware that $5,000 plus travel expenses is rather much for the importation of a mere chemical ingredient. The tape also establishes that petitioner knew that Collins had a friend who had become a heroin addict, whereas Mauricio did not know Collins at all. It was petitioner, not Mauricio, who knew that Collins would need to be deceived in order to convince him to import heroin.

This defense, to the extent that it is independent of petitioner's actual story, is rather technical in the sense that its main thrust is not that petitioner was innocent, but rather that he was incorrectly indicted for conspiracy to import heroin as opposed to a conspiracy to import some non-drug chemical. It assumes, for purposes of argument, that petitioner may in fact be guilty of a conspiracy to import some sort of chemical ingredient, but not of a conspiracy to import drugs.

A critical weakness of this defense is, however, that it does not work for the other conspiracy with which petitioner was

---

illicit drug. Collins' failure to challenge petitioner's story that the substance was a mere "chemical ingredient" need not be construed as contradicting his plea allocution that he realized he would be importing a drug, and Collins himself saw no contradiction. See Trial Tr. at 169-72.

charged – the conspiracy to possess heroin with intent to
distribute under 21 U.S.C. §§ 846, 841.  Collins' testimony,
corroborated by the tape, unquestionably establishes that the
ultimate aim of the conspiracy was the possession of Ecstasy with
intent to distribute.  Since Ecstasy is a Schedule I controlled
substance, such a state of mind would suffice for conviction for
conspiracy to possess heroin with intent to distribute under
Morales.

Having thus established a conspiracy to possess a controlled
substance under Morales, the substantive charge of importing
heroin could then be established under the Pinkerton doctrine,
which permits a jury to convict a defendant of a substantive
offense if the jury finds:  (1) he was a member of a conspiracy;
(2) another member of the conspiracy actually committed the
substantive offense; (3) commission of the substantive offense
was in furtherance of the conspiracy; and (4) the defendant in
question reasonably could have foreseen that the substantive
offense would be committed.  Pinkerton v. United States, 328 U.S.
640, 645-48 (1946).  The standard of reasonable foreseeability,
less than actual knowledge, would easily have been met under the
circumstance of this case.  In the instant trial, ultimately a
Pinkerton instruction was not given to the jury, but it is hardly

clear that a different decision would have been incorrect.[16]

It may be assumed, for purposes of this decision, that Jacobs' confidence in his interpretation of <u>Morales</u> was reasonable as applied to the importation conspiracy.  However, this defense –  that petitioner thought the object of the conspiracy was the importation of a non-drug chemical – was relevant to only one (or at most two) of the three charges.  At trial, it was an argument worth making to the court, and perhaps even to the jury.  Nonetheless, in a case where all sentences would be concurrent, it should have played hardly any role in the decision to take the case to trial.

Moreover, petitioner's defenses worked against one another. Petitioner, faced with the problem of explaining why he made so many phone calls to Collins in the weeks before the trip, explained in his trial testimony was that he was calling Collins to talk him out of going.  Yet petitioner himself was a dealer in marijuana with a prior conviction for possession of about $2,000 worth of Ecstasy.  It is hard to explain why petitioner would be so zealous to dissuade Collins, unless petitioner knew the matter to be far more serious than the sort of illegal conduct he himself customarily engaged in.

---

[16]In fact, this court's decision at trial was based on an understanding, possibly incorrect in light of the above, that the government was trying to base its <u>Pinkerton</u> argument on an unindicted conspiracy.

There can be no conclusion from the above other than that
Jacobs' optimistic assessment of petitioner's chances of victory
at trial was unjustified, and it may fairly be inferred that such
assessment was communicated to petitioner, as petitioner alleges.
However, it is not enough to say, in hindsight, that Jacobs made
an error in judgment.  Rather, it must be shown that in light of
the totality of the circumstances the error was unreasonable
given the standards of the profession.

In the context of this particular inquiry, petitioner's
protestations of innocence have minimal relevance.  Any
experienced defense attorney knows that guilty defendants often
insist on their innocence to their counsel.  Furthermore, even an
innocent defendant is entitled to an assessment that does not
mislead him as to the current strength of his case and the threat
of conviction. More significant factors are the relative
importance of counsel's performance and the time pressures
involved.  An error in judgment made under pressure of time or
when the stakes are low is entitled to more deference than one
regarding a critical high-stakes decision where the attorney has
had weeks to prepare.  "[T]he decision whether to plead guilty or
to contest a criminal charge is ordinarily the most important
single decision in a criminal case ... [and] counsel may and must
give the client the benefit of counsel's professional advice on
this critical decision." <u>Gordon</u>, 156 F.3d at 380; <u>Boria</u>, 99 F.3d

at 496-97 (quoting Anthony G. Amsterdam, Trial Manual 5 for the
Defense of Criminal Cases (1988)). "[K]nowledge of the
comparative sentence exposure between standing trial and
accepting a plea offer will often be crucial to the decision
whether to plead guilty." Gordon, 156 F.3d at 380 (citing United
States v. Day, 969 F.2d 39, 43 (3d Cir. 1992)). Jacobs had many
weeks, if not months, to assess the strength of the case against
petitioner and the impact of the tape. Moreover, the stakes were
enormous. The government was eager for petitioner's cooperation,
and in light of his minor role in the conspiracy, he had an
excellent chance of doing little or no jail time if he
cooperated. In contrast, petitioner, if convicted after trial,
faced a minimum of ten years. Under these circumstances, there
appears to be no reasonable basis upon which a competent defense
attorney would have reached the conclusion that petitioner had a
"winnable" case, or that the tape was exculpatory as to the
conspiracy to possess a controlled substance. Jacobs' advice to
petitioner was a constitutionally deficient performance.

(4)

To establish prejudice, petitioner must "show that there is
a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different."
Strickland, 644 U.S. at 694; see also Mask v. McGuinnis, 233 F.3d
132, 140 (2d Cir. 2001) (petitioner need only show that but for

counsel's errors there was a reasonable probability that the
result of the plea bargaining process would have been different).
Once such a showing is made, the claim is not defeated by a
showing that counsel provided competent representation in a more
general sense.  See Henry v. Poole, __ F.3d __, 2005 WL 1220468
(2d Cir. May 24, 2005) (holding that a state court unreasonably
applied Strickland when it avoided addressing the probable impact
of counsel's unprofessional errors based on of a finding that
counsel provided "meaningful representation" overall).

As applied here, the question is whether there is a
reasonable likelihood that petitioner would have elected to
cooperate had he received reasonable advice as to the strength of
the case against him.  Petitioner's protestations of innocence
need not be construed as proof that petitioner would not have
cooperated.  See Mask, 233 F.3d at 141; Cullen, 194 F.3d at 407.
There can be little doubt that the standard for prejudice is met.
It is uncontested that petitioner was willing to cooperate at
least to the extent that he was willing to provide information
against Saenz.  This is consistent with what he told Jacobs, with
what he told Agent Tsang, and with his willingness to provide
information to Collins on the tape.  His hesitancy was apparently
motivated by a desire, which would ordinarily have been prudent,
to check with an attorney before weighing his options.  Naturally
he hoped, if possible, to avoid conviction altogether, and

thereby prevent his family from learning of his new drug-related
troubles.  But there is no reason to assume he would not have
reconsidered had he been given competent advice.  Although he did
lie to his attorney, there is no basis for assuming he would have
stuck to this story if Jacobs had provided reasonable advice
concerning the serious danger of conviction and the comparative
advantages of cooperation.  Jacobs, by unreasonably telling
petitioner that his story was a good one, that the tape supported
his innocence claim and that the government's case was weak, gave
petitioner precious little incentive to say anything else.

(5)

Respondent, however, argues that the Second Circuit has
essentially rejected those claims, which cannot be heard anew in
this petition.  It is well settled that petitioner may not employ
a § 2255 petition to relitigate claims already raised and
considered in a prior § 2255 petition or on direct appeal.
Riascos-Prado v. United States, 66 F.3d 30, 33 (2d Cir. 1995);
Williams v. United States, 731 F.2d 138, 141 (2d Cir. 1984),
cert. denied, 469 U.S. 1188 (1985).  See also United States v.
Sanin, 252 F.3d 79, 83 (2d Cir. 2001); Cabrera v. United States,
972 F.2d 23, 25 (2d Cir. 1992).  Reconsideration is permitted
only where there has been an intervening change in the law and
the new law would have exonerated a defendant had it been in
force before the conviction was confirmed on direct appeal.  Chin

v. United States, 622 F.2d 1090, 1092 (2d Cir. 1980).
Petitioner makes no claim of any intervening change in the law
applicable here, so it only remains to be determined if the
grounds upon which petitioner currently claims relief are the
same grounds that were already raised and considered on direct
appeal.

Additionally, a defendant who fails to raise a claim on
direct appeal generally is barred from advancing it in a
subsequent § 2255 petition unless he can show cause for his
procedural default and actual prejudice resulting from the error.
However, this rule, articulated in Campino v. United States, 968
F.2d 187, 190 (2d. Cir. 1992), no longer applies to claims of
ineffective assistance of counsel.  As the Supreme Court recently
held, such a claim may be raised in a subsequent § 2255 motion
regardless of whether such a claim could have been raised earlier
on appeal.  Massaro v. United States, 538 U.S. 500 (2003).

Prior to the Supreme Court's decision in Massaro, the Second
Circuit had adopted a more limited exception to the Campino rule,
holding that it would still apply to bar claims of ineffective
assistance of counsel in cases where "(1) the petitioner was
represented by new appellate counsel on direct appeal, and (2)
the claim is based solely on the record developed at trial."
Billy-Eko v. United States, 8 F.3d 111, 115 (2d Cir. 1993).

The Billy-Eko rule created a dilemma for appellate counsel

who fell within its scope. See Massaro, 538 U.S. at 506-507. On the one hand, the rules of Campino and Billy-Eko obliged them to raise any ineffectiveness claims that were fully supported by the record. On the other hand, any ineffectiveness claims brought as part of a § 2255 motion sharing the same "legal ground" as those raised on direct review would be barred under Williams. See Williams, 731 F.2d at 141 (distinguishing claims based on new legal grounds, which are not barred, from new factual arguments in support of a ground previously raised, which are barred).

In an attempt to resolve the tension created by this "legal quandry," the Second Circuit held in Riascos-Prado that whenever the procedural rules of Billy-Eko would lead to different results for related claims, those claims would be treated as though they were different "grounds" for purposes of the Williams rule. 66 F.3d at 35. Indeed, Riascos-Prado provides the appopriate framework to analyze this petition.

When petitioner brought his direct appeal in the instant case, he was represented by Kellman as new appellate counsel. Kellman was, therefore, obliged under Billy-Eko to raise on appeal claims of ineffectiveness that were supported by the record below. The claims she did raise were in fact squarely based upon statements that Jacobs made on the record. However, Riascos-Prado makes clear that petitioner cannot now be barred from raising ineffectiveness claims that could not be supported

by the record below at the time of his direct appeal.

Petitioner's current claim is that Jacobs misled petitioner by providing an unreasonably optimistic assessment of his chances of acquittal following trial. The specific claim was not raised in any of the appellate or pro se supplemental briefs presented in the Second Circuit. Importantly, it could not have been raised without an opportunity to gather evidence regarding the bases of Jacobs' assessment, which could only take place, and did only take place, in conjunction with the instant habeas petition.

There appears to be no principled basis for distinguishing the instant claim from that which was held not to be barred in Riascos-Prado. There, one of Riascos-Prado's previously-litigated claims had been that counsel failed to explain to Riascos-Prado the consequences of his guilty plea. 66 F.3d at 32. The subsequent § 2255 claim, held not to be barred, was that a conflict of interest had prompted counsel to advise Riascos-Prado to plead guilty. Id. at 33. That the two claims were intimately interrelated was clearly not determinative.

Another subsequent claim by Riascos-Prado, which was held to be barred, was that counsel did not explain the sentencing guidelines to Riascos-Prado at any time prior to the entry of his guilty plea. Id. This was held to be "a slightly altered rearticulation of the claim that was rejected on direct appeal." Id. at 35. It does not appear that the same can be said here.

41

Petitioner's current claim is analytically distinct from those raised on appeal, and can be recognized as meritorious without finding any fault with the logic or specific findings of the Second Circuit. For instance, the Second Circuit's conclusion that the advice challenged as ineffective (including the advice against cooperation) resulted from petitioner's decision to deceive his attorney is entirely consistent with the analysis presented here.

This claim, consequently, equally constitutes a separate "ground" as the conflict-of-interest claim at issue in Riascos-Prado. Moreover, in light of the Second Circuit's policy, in effect before Massaro, of declining to review ineffectiveness claims that would more properly be addressed in a § 2255 petition, there is a presumption that the Second Circuit did not intend to resolve or foreclose any questions besides those specifically raised. See United States v. Salameh, 152 F.3d 88, 160-61 (2d Cir. 1998) ("[I]t must be remembered that the Billy-Eko doctrine is discretionary, and, given the baseline aversion to resolving ineffectiveness claims on direct review ... it should not be invoked lightly."); see also United States v. Gaskin, 364 F.3d 438, 467-68 (2d Cir. 2004); United States v. Morris, 350 F.3d 32, 39 (2d. Cir. 2003). In light of these considerations, it appears that no procedural bar forbids addressing the merits and granting relief.

Where there has been a finding of ineffective assistance of counsel on a § 2255 proceeding, the remedy "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily impinge on competing interests." <u>United States v. Morrison</u>, 449 U.S. 361, 364 (2d Cir. 1981); <u>Gordon</u>, 156 F.3d at 381.  Such competing interests include the necessity of preserving society's interest in the administration of criminal justice.  <u>Id</u>.  Petitioner has already served more than six years of his ten-year sentence, certainly far more time than he would have served under a cooperation agreement with the government.  Under these circumstances, the appropriate remedy is to grant the relief requested and resentence petitioner to time served, without disturbing the judgment of conviction.  <u>See</u> <u>Boria</u>, 99 F.3d at 499.

## Conclusion

For the foregoing reasons, the petition is granted.
Petitioner's sentences are hereby vacated as to all three counts
of conviction.  Petitioner is hereby resentenced to time served
as to all three counts of conviction.  Petitioner is to be
discharged, but the judgment of conviction is not disturbed.

The Clerk of the Court is directed to close this case.


Dated:     Brooklyn, New York
           June 2, 2005


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge

SENT TO:


John J.E. Markham, II
One Commercial Wharf West
Boston, MA 02110

Jo Ann M. Navickas
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
One Pierrepont Plaza
Brooklyn, NY 11201